Thank you. Good morning, Your Honors. May it please the Court. Scott Sell for Plaintiff Appellant. I'd like to reserve two minutes at the end of my opening argument. Okay, keep your eye on the clock. Thank you. Well, Your Honors, this is a Social Security case in which the plaintiff sought a closed period of benefits running from August 2014 through August 2016. That is, the claimant alleged he was disabled for a discrete period of time that ended with his recovery in 2016. There are two key pieces of opinion evidence in this case. The first key piece of opinion evidence is the opinion of two treating or two examining physicians. No, sorry, two reviewing physicians. These are the physicians hired by the Social Security Administration through the state agency. Both of these reviewing physicians offered the opinion that due to his mental illness, the plaintiff is unable to respond appropriately at work due to his low tolerance for frustration. The second key piece of opinion evidence comes from the plaintiff's treating psychiatrist. The psychiatrist is Dr. Tai. Dr. Tai opined that the plaintiff is unable to perform any work during the closed period because he could not respond appropriately to others, and he could not maintain concentration, persistence, and pace, and he would miss too much work due to his mental illness. The Commissioner's ALJ erred with regards to both of these two pieces of opinion evidence. With regard to the state agency doctors, the ALJ failed to provide specific and legitimate reasons supported by substantial evidence. His written decision in the ALJ proffered one reason for rejecting the state agency doctors, and that reason is that the plaintiff was able to work in 2017. But that reason doesn't make any In fact, he specifically alleged she recovered in 2016. In the defendant's brief, the defendant argues that the ALJ's reason is legitimate because the ALJ, in fact, relied on a separate doctor, Dr. Wichert. However, the ALJ makes no mention of Dr. Wichert in his discussions of his rejection of the state agency doctors. Dr. Wichert, is it your position that failure to name the specific doctor upon whom the ALJ is relying and that that doctor's diagnosis or relation of symptoms is error? He cannot just the ALJ errors if he simply says that the medical record conflicts with Dr. Tai. Even if it does conflict with Dr. Tai, unless he calls out the specific doctor and the specific diagnosis or opinion of that conflicting doctor? No, your honor. Our argument is that the court must be able to review the decision put forth by the ALJ and the ALJ's reason must, the ALJ's decision must sufficiently identify his reasons for the court to review it. It's the same argument that you hear with any issue involving a post-hoc rationalization. The argument in this case is that, is not that the simply, not simply that the ALJ failed to recite specific magic words or identify the right doctor in the right section, is that the ALJ's reason, as it's reasonably discerned by the court, is not the reason put forth by defendant on appeal. Explain that to me. The ALJ said that the medical records contradicted Dr. Tai and he gave little weight to Dr. Tai because of that contradiction. Is it your position that, what was wrong with that reasoning? Oh, with the reasoning with regards to Dr. Tai. That's separate than the reasoning with regard to the state agency doctors. But the ALJ offered four reasons for rejecting Dr. Tai. And one of them, I think that's what your honor is talking about, is the ALJ's fourth reason in which the That reason is error because it's not specific. Because simply identifying the whole of the medical record does not allow this court reviewability. Is your argument that that boilerplate can't be remedied? Like, could we discern what he might have meant or she, I can't remember the gender of the ALJ, what the ALJ meant by that? Yes, this court could discern what the ALJ meant by that, but the court does not comb through the medical record to figure it out. It all depends on the language put forth by the ALJ. And it's simply a bold assertion that the record as a whole does not support the opinion is insufficient. So is the remedy that you're seeking just a remand so that the ALJ can give us particularity or is it an award of benefits? It's a remand, your honor. We are not asking this court to credit as true. We're simply asking this court to require the ALJ to adequately express his opinion. Yeah, yeah. My guess is that if we do that, and that isn't my understanding, that is my understanding is what you're asking for. What we're going to get is the ALJ is going to say, well, you know, I pay a lot of attention to the opinion of Dr. Donna Witcher. And that strikes me as a better analysis of it. I'm a little concerned that if we remand, we're going to get something that will fully satisfy and that's the end of it. And it will have been, you know, a lot of work for no different answer. I hear your concern, your honor. But the reason that this is before the court is because the outcome in this case, you know, I don't think we can necessarily predict what the ALJ is going to do on remand. ALJ is often, when confronted with an order of a court, reconsider their position. And we, in fact, don't know that the ALJ credited Dr. Witcher in this case. I think that assumption, the assumption that's implicit in your question is that the ALJ, in fact, credited Dr. Witcher. The ALJ. That is the implicit assumption. You're right. I do have to say that I'm. I think I'm back in business. Can you hear me? Oh, I'm not sure it's hooked up. We can't hear you yet. Can you hear me? Record. I'll jump on that and fix it. One moment, please. All right, judge, try that again for me. Let's see. All right, judge, do you hear me? I can hear Kwame. I can hear Kwame, but not Judge Fletcher. I can't hear Judge Fletcher either. OK, one moment. Let me go back in there. Judges, I have or I've muted the stream. I'm going to run up to room 280 and see what I can do there. You'll have to speak louder. I can't hear you, Kwame. OK, I'm sorry. It'll just take me a couple minutes. I've got to run up to 280 to help the judge. All right. OK, we're muted on the stream. Sorry about the difficulties. We'll get this organized soon. I appreciate the help. Thank you. Are you both actually in Portland? I am, yeah. Are your honors sitting in Portland right now or somewhere else? No, we are in different places in the Bay Area. I'm actually on Bainbridge Island. Oh, lovely. That's very nice. Yeah. Are you there all the time or for the pandemic? We moved out here about three weeks ago. So enjoying the change of scenery from Seattle. I was in Seattle before. That sounds wonderful. We hope we'll be able to visit the courthouses in your locations before long. My fault. Somehow this cord was just there and I just kicked it. Oh, we can hear you now. Now we can hear you. Didn't hear that. Can you hear me? Now we can. Yes. This is Kathy, your courtroom deputy. I'm going to wait for Kwame to come back on because he will turn the public audio back on. We're not on public audio right now. Can you hear me? Yes. Yes. And I can hear you. So you'll tell us when we're back online. Yeah, we need to have Kwame to hit the public audio. Okay, well, I apologize. I crossed my legs under the table, pulled the cord out from the microphone and everything went south from there. We need you to be comfortable. There you go. As long as we're in the chit chat. I was married on Bainbridge Island. So I know Bainbridge Island very well. Where do you live on Bainbridge? Your microphone's on. You're muted. Yeah, there we go. We're about a mile north of the ferry, where the ferry comes in, close to Winslow on Ferncliff. So just north of Winslow? Yeah. Yeah, well, Bainbridge is a nice place. It's beautiful. We've got a hiking group. Every summer we go hiking with a lot of friends from Bainbridge Island. So for historical reasons, we've got very close ties to Bainbridge. Yeah, hiking seems to be the thing to do and lots of beach trips. Well, I apologize that I've messed us up here, but I think Kwame is going to get us all fixed up again. All right, public audio is back on right now. Okay, thank you. Thank you, Kwame. So we're now back hearing argument again after I accidentally unplugged us. And Mr. Sell, you were in the middle of your argument, and I can't remember precisely what was being said when I so rudely interrupted us. So Mr. Sell, it's all yours. I think you were asking about harmlessness effectively. Maybe you could speak to whether we should be considering harmlessness because a remand wouldn't be worthwhile. Yeah. Yes, I gladly speak to that. The harmlessness analysis does not involve whether or not a remand would be worthwhile. The harmlessness involves whether or not the error in fact affects the outcome of the decision. And the error in this case certainly affects the outcome of the decision. And that's because if we credit the opinions that were not, that there was no explanation for the rejection that was adequate, we would find that your client was disabled. Well, if the ALJ did that, yes, Your Honor. And the question is more precisely whether or not the ALJ's error with regard to those decisions would affect the outcome. And it would. But it's like a two-step, right? The error is not having an adequate explanation. And so are we supposed to consider if you credited those doctors, or sorry, if the ALJ credited those doctors, what the result would be? That's one way of looking at the analysis. Yes, Your Honor. If you look at it as if the ALJ gave better explanation, that won't help you. Well, the ALJ has to give a legally sufficient explanation in order to reject the decision. So yes, I suppose if the opinions were credited, it would result in a different outcome. And consequently, the error is not harmed. Okay. So I think we've got your position in hand. Let's hear from the government and we'll give you a chance to respond. Thank you. Ms. Stuckey. Good morning. I'm Shada Stuckey appearing on behalf of the Commissioner of the Social Security Administration. We ask the court to affirm the judgment of the district court and deny Mr. Wilson's request to remand the case for further proceedings. This case primarily concerns the medical opinions addressing Mr. Wilson's mental impairments, and substantial evidence supports the ALJ's assessment of these opinions. Before I get too far into what I had planned, I did want to point out that the ALJ specifically gave great weight to Dr. Whitcher's opinion. And this is on excerpts of record at page 72. It says, the undersigned gives great weight to Dr. Whitcher's opinions because he is a psychologist who examined the claimant and assessed his limitations. In addition, the doctor's opinions are well supported by her examination report. And the paragraph right above that is a detailed summary of all of her normal findings of Mr. Wilson's mental functioning. And that's on the excerpts of records at 71 and 72. So are you saying then that when the ALJ at the end of the paragraph telling us why he doesn't pay much attention to Dr. Tai, when the ALJ writes finally, the medical record as a whole does not support the severity of her opinions, that that's a reference to Dr. Whitcher? Yes, yes. And all the other findings that are in the decision about the record. But Dr. Tai is the only treating physician whose opinion we have, right? Yes, yes. And don't we need good reasons for rejecting Dr. Tai that are explained by the ALJ? Yes. And I believe that we need specific and legitimate reasons. And we have that in the two, at least two of the reasons given by the ALJ, because it was not supported by the medical record as a whole. And because Dr. Tai- That's just boilerplate, isn't it? Don't we have opinions that say you can't just give boilerplate without explanation? Well, I mean, I think there's Molina, which says if the ALJ's reasoning can be discerned, reasonably discerned, that that is a basis for affirming. And I think it's very clear in this case that the ALJ gave great weight to Dr. Whitcher's opinion. He cited it at numerous places, numerous times throughout the decision, both with reference to his step three findings and when assessing Mr. Wilson's subjective complaints and the medical opinion evidence. And whereas here an ALJ is presented with conflicting medical opinions, the ALJ is required to resolve the conflicts. One medical opinion necessarily impacts the analysis of another. And as the court recently noted in the Ford decision, it is the ALJ's responsibility to resolve conflicts between conflicting medical opinions. So again, if you go back to Molina, the record here is clear enough to reasonably discern the agency's path. It can be reasonably discerned that Dr. Whitcher's opinion was part of the ALJ's assessment in rejecting the more extreme opinions in the record. But here's my problem. It may be sort of a technical problem, but nonetheless, it's a problem as pointed out by Mr. Sell. The specific reasons given by the ALJ really don't work. And the only reason that seems to work is the boilerplate reason. Can you tell me, there are three specific reasons. Are any of those reasons valid? Mr. Sell says that none of them is valid. Are any of them valid? Yes, your honor. Which one are ones? Yeah. So admittedly, the ALJ could have provided more detail. No, no, no, no, no, no. Please focus. The other three, the first three. Yeah, there are three specific reasons. And Mr. Sell says each one of them is not a decent reason. Is any of them a good reason? If so, tell me how. Yes, I think so. There's two reasons that we would like to rely on, in addition to what the court is calling a boilerplate, that he was able to resume his full-time work repairing boats and engines in 2017, and that Dr. Tai did not take into account Mr. Wilson's abilities if he followed up with consistent treatment. No, no, no, no. Let me do it more precisely. Okay, the first reason given by the ALJ, and I'm just reading now from the ALJ at the top of page 14 of his order, first, the severity of her opinions is inconsistent with the claimant's current work activities, which involve repairing boats and engines. Well, he doesn't claim to be disabled now. He claims to have been disabled in the past. So that does not strike me as a good reason, unless you can persuade me otherwise. Well, I'd like to try. I think that when you are reading this in the context of the whole decision, Dr. Wilson's opinion does reference this period of time prior to the alleged fear of disability. No, I'm sorry. That's Dr. Wicher. I'm asking you to defend that reason, which to me is just wrong. Okay. I mean, the point is that this point about Mr. Wilson's ability to work is not completely off-base, because we do have Dr. Wicher's opinion that is talking about a period where he was working. And then she says that his ability is functioning during the alleged disability. I'm done with the first reason, because you keep talking about Dr. Wicher and what the ALJ says he's working now. It's not contested that he's working now. His argument is I couldn't work earlier. Okay. Second reason given. Second, she did not take into account the claimant's abilities if he followed up with consistent treatment for his impairments. As I see the record, he's quite careful, actually, at following through on the recommended treatments. Am I mistaken in reading the record? Well, again, I think that, yes, in following up with his going to appointments, I think there could be fine. But I think the broader point here that when he was taking his medication, that was actually one of the key arguments during- I thought in footnote five of your brief, you said you weren't relying on this argument. Well, I think we do want to make the point that when he was taking his medication, that's when he really started to improve and he was functioning well. And we defended that under the record as a whole. But I think it also fits in here. And I did want to really- Are you changing your position from your brief? I'm confused. I thought you had backed away from the second reason the ALJ gave. I guess I would like to defend it to the extent that Dr. Tai's letter, he specifically describes how Mr. Wilson progressively recovered with treatment and especially with medication. And at Mr. Wilson's hearing, his attorney told the ALJ that this was his theory of the case. Mr. Wilson had significant improvement with medication and that this was his reason for being able to return to work. So why does your brief say the commissioner does not rely on this statement that he did not follow consistent treatment? At the time, I mean, because I do think it's hard to defend that he was- because he was going to- I think defendants or Mr. Wilson's brief says that he went to like 72 appointments. But I think the broader point about him being- once he got on the right dosage of medication, he did improve. But that's about the period after, isn't it? Isn't that the same point as the first one that he's able to work now? It said- but we do have case law. This is the Ware decision. It says, it is well established that an impairment is not disabling if it can be controlled effectively with medication. And here we have Mr. Wilson's attorney saying his disability period ended in August 2016, the date at which Mr. Wilson was fully titrated to his new medication. So this is a medication issue. Once he got on the right medication, he was good. That's not the type of impairment that we award benefits for. And so to the extent- I mean, I do think that the ALJ's decision does get there. I mean, it's not the perfect specific thing. But if we're looking for the path that can be reasonably discerned, it's there. My problem with this case is- I mean, I'm very torn on this one. But my problem with what the ALJ did, it looks as though he's just mailing it in. And the three specific reasons that he gives for rejecting Dr. Tai are exactly verbatim the reasons that he gives for rejecting Dr. Sota. And they really aren't very good reasons. There may be good reasons, but he doesn't give them. I think if you look at what the ALJ is doing, he found Dr. Whittier's opinion very persuasive. And the opinion of an examining doctor that's backed up by specific medical findings is substantial evidence. And that is the standard that we're looking at here. It's substantial evidence supporting this mental residual functional capacity. And I think in that regard, the ALJ's decision is quite detailed. He goes through it. We think that the first three reasons are wrong. So I know you're trying to salvage them. But if we disagree with you and think the first three specific reasons are wrong, why should we turn somersaults to make sense of the fourth reason? If the ALJ has made three mistakes, why should we assume that there's a discernible path that's right on the fourth one? I mean, again, because the standard here is substantial evidence. And I think that when you look at this case, there is substantial evidence. The key piece of evidence here is Dr. Whittier's opinion. And I wanted to point out some really critical things from Dr. Whittier's opinion. Her report noted a long history of problems stretching back to when Mr. Wilson was a juvenile that included criminal charges for forgery, resisting arrest, many minor assault charges, and as well as assaulting a peace officer. And despite these rather significant behavioral issues, Mr. Wilson had jobs. He brought in considerable income up until his workplace. And he got fired from three out of the four of them. But if you look at his income, it's quite substantial. This is on ER 230 in 2011, 38,000 in 2012, 26,000 in 2013, 40,000. And this goes on until he was injured and he had a physical injury. So that's what triggered this period of disability. It was a physical injury. It's worth noting that Mr. Wilson told Dr. Whittier that his five years of sobriety ended with a relapse following his workplace injury. By the time of Dr. Whittier's examination in September 2015, he had been clean and sober again for seven months. And so if you just look at this overall record, it shows that as Dr. Whittier noted, Mr. Wilson had mental impairments and social impairments long before his alleged disability onset date. But critically, he was able to work, especially when he was sober during the five years. Those are really good reasons. I wish the ALJ had written them. It's in there. It's in there. I mean, the ALJ. Sorry, how do you deal with our Treviso or Treviso opinion, though, that says that because the ALJ did not provide the explanations herself, the district court erred in looking at the remainder of the record to put together what the ALJ's reason might have been. I don't understand how we can do what you're saying in light of Treviso. I don't think you have to look at the rest of the record. I think it is in the ALJ's decision, especially if you look at Tonopetian. It says that there is substantial evidence when the ALJ relies on examining doctor's opinion based on her own mental examination findings. That is what we have here. We have a really good explanation, detailed summary of what's there, and that it is persuasive evidence. And then you have references back to it when the ALJ is discussing these other doctor opinions. So I think I really do think you don't have to look to the rest of the record. You can look right at the ALJ's decision, and it's in there. Okay, good. Any further questions from the bench? I'm just talking. Okay, thank you. Let's put two minutes on the clock for Mr. Schell. Oh, you're muted. Thank you. Oh, there you go. Okay, quickly address these points. Defendant says that the ALJ's second reason that plaintiff failed to follow up consistently with treatment is a legitimate reason because plaintiff got better when he took medication. Plaintiff was never prescribed the right medication, and he improved when he got the right medication. And that's when he said he got better. You know, here's a problem I've got, and I'm not sure how to deal with it as a technical matter. The letter in which we really get the diagnosis or the assessment of Mr. Wilson's ability to work is the letter that you quote from. But the beginning of that letter, I'll just read it to you. I'm on ER 1116. Alexandra Simpton spoke with Robert Wilson, Social Security Attorney, Scott Schell, on August 16, 2017. Mr. Schell asked Ms. Simpton questions based on Mr. medical records and helped draft this statement. Now, that's a red flag to me. The next sentence is, each of the providers who signed the statement agree that it accurately reflects their professional medical opinions. I see that. On the other hand, this looks like something that you very much not only, they say you helped draft it. And the assessment looks very much like a lawyer's assessment in the sense of, well, 20% of the time that he's actually at work, he's not going to be on task and he's going to miss two days out of the month. I don't think a doctor would ordinarily give it that way with that degree of precision. This letter just, I think the AOJ looked at that letter and said, Mr. Schell drafted that letter. Well, Your Honor, the commissioner's regulations state that any attorney who talks to a doctor about a statement must put that statement in the letter. And that's why the statement in the letter. And it's certainly true. But the AOJ did not reject this letter because of the attorney's involvement in drafting it. Oh, no, I understand. That's why I prefaced by saying, I'm not sure what I'm supposed to do with that. But nonetheless. Yeah. Well, Your Honor, there's... With the strength of that letter, that's really a lawyer, that's a lawyer's letter that the doctor signed. Well, I agree with that, Your Honor. And the doctors want to be able to address the specific limitations that address the commissioner's concerns. And the lawyer can certainly help them do that. Yeah. There's also a case law that says that an AOJ cannot reject the opinion of a doctor because of an attorney's involvement unless there's specific evidence that shows that the doctor's opinion was not, in fact, the doctor's opinion. And the doctor is very clear that this is the doctor's opinion. That's correct, Your Honor. If I might also address the excerpt of records cited by defense counsel. This is excerpt of record 71, in which the AOJ discusses giving great weight to Dr. Wichert. Defense counsel did not read the final sentence of that paragraph, which says, quote, accordingly, the undersigned has adopted several, that is several, not all of Dr. Wichert's opinions into the paragraph B and the residual functional capacity. Um, were this court to accept defendant's argument that the AOJ was in fact thinking about Dr. Wichert when he rejected these other key pieces of opinion evidence, the court could discern what aspects of Dr. Wichert's opinion were adopted by comparing Dr. Wichert's opinion and the RFC. If the court did that, they would see that there are only two elements of Dr. Wichert's opinion that show up in the RFC. One of them is his inability, the plaintiff's inability to interact with others. It's not disputed. The other one is plaintiff's ability to perform simple routine work, but that doesn't align with either of the limitations put forth by Dr. Tai or the state agency doctors. State agency doctors say he can't work because he can't deal with changes in the workplace set. So even if you accepted defendant's argument that Dr. Wichert was behind the AOJ's rejection of Dr. Wichert's opinion, you would find that the aspects of Dr. Wichert's opinion that show up in the decision don't align with those opinions and consequently aren't inconsistent. Okay, good. Any further questions from the bench? Thank both sides for your helpful argument, and I apologize for the interruption that I produced. Wilson v. Stahl, submitted for decision. Thank you very much.
judges: W. Fletcher, Bea, Friedland